**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3505
_____

ERNEST PORTER,
                                        Appellant

v.

PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
JOHN E. WETZEL, Secretary for Department of
Corrections; ROBERT GILMORE; Super. for SCI Greene
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. Action No. 2-17-cv-000763)
Magistrate Judge: Hon. Maureen P. Kelly
_____

Argued October 22, 2019
_____

Before: GREENAWAY, JR., PORTER and COWEN, *Circuit Judges*.

(Opinion Filed: September 1, 2020)

Bret Grote [Argued]
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA 15221

Daniel M. Greenfield
Roderick & Solange MacArthur Justice Center/Northwestern
Pritzker School of Law
375 East Chicago Ave.
Chicago, IL 60611
        *Counsel for Appellant*

Michael P. Doss
Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603
        *Counsel for Amicus Appellant*

Laura Rovner
Student Law Office – Civil Rights Clinic University of
Denver College of Law
2255 E. Evans Ave., Suite 335
Denver, CO 80208
        *Counsel for Amicus Appellant*

Daniel B. Mullen [Argued]
Kemal Alexander Mericli
Office of Attorney General
1251 Waterfront Place, Mezzanine Level
Pittsburgh, PA 1522
        *Counsel for Appellees*

—————————

OPINION

—————————

GREENAWAY, JR., *Circuit Judge*.

In this case, we must decide whether our 2017 decision in *Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549 (3d Cir. 2017), applies not only to death row inmates who have been granted vacatur, but also to death row inmates whose vacatur orders have been stayed pending appeal pursuant to local district court rules. In other words, we must determine whether the fact that a Pennsylvania state inmate received habeas relief in federal court, and is thereby subject to local rules, means that that inmate does not have a procedural due process right in avoiding continued indefinite solitary confinement. We decide that *Williams* governs this case and now hold that the existence of a stay does not extinguish procedural due process rights.

We are also asked to decide whether thirty-three years of solitary confinement may violate the Eighth Amendment. We answer this question in the affirmative. We acknowledge, as we must, that the claimed Eighth Amendment right here has not been clearly established. Further, we hold that representatives of the Pennsylvania Department of Corrections are entitled to qualified immunity on the Eighth Amendment claim. We will therefore reverse and remand in part and affirm in part.

# I.    BACKGROUND

## A.    *Procedural Background*

Plaintiff-Appellant Ernest Porter was convicted of murder in the first degree and sentenced to death in the Philadelphia County Court of Common Pleas in 1986. Since then, he has been incarcerated in the Pennsylvania Capital Case Unit ("the CCU"). He is currently housed at SCI Greene.

After his conviction and sentence were affirmed on direct appeal, Porter filed a Pennsylvania Post Conviction Relief Act ("PCRA") petition in state court. It was denied. But on June 26, 2003, a federal district court in the Eastern District of Pennsylvania granted, in part, Porter's 28 U.S.C. § 2254 petition. Most important, as relates to the present appeal, the District Court granted Porter relief regarding his sentence after determining that his penalty phase verdict form was unconstitutional. The District Court's order vacated Porter's death sentence and required the Commonwealth to conduct a new sentencing hearing within 180 days. Finally, the District Court stated that this order would be stayed if either side appealed: "[I]f either Petitioner or Respondents file an appeal to the United States Court of Appeals for the Third Circuit, the entry of this Order will be stayed pursuant to Eastern District of Pennsylvania Local Rule 9.4(12) pending the disposition of that appeal." *Porter v. Horn*, 276 F. Supp. 2d 278, 365 (E.D. Pa. 2003). Local Rule 9.4(12) provides: "If a certificate of appealability is granted, the court must state the issues that merit the granting of a certificate and must also grant a stay pending disposition of the appeal, except as provided in 28 U.S.C. § 2262." E.D. Pa. Civ. R. 9.4(12).

4

Both Porter and the Commonwealth appealed to the Third Circuit, and the District Court's order was stayed. On February 7, 2007, we granted Porter's motion to temporarily hold the appeals in abeyance while the Pennsylvania courts adjudicate another PCRA petition that Porter has filed. We ordered the parties to file periodic status reports every sixty days. Because the Pennsylvania courts have not resolved that petition, the Third Circuit appeals remain in abeyance. The parties last filed a status report on June 30, 2020. *Porter v. Horn et al.*, ECF No. 03-9006 (3d Cir. June 30, 2020).

Porter filed the case before us in the Western District of Pennsylvania on June 12, 2017. He was initially pro se, but subsequently obtained counsel. *See Porter v. Penn. Dep't of Corrs.*, 2:17-cv-763, ECF Nos. 1, 28-31. In his suit, Porter argued that Defendants violated his rights under the Eighth and Fourteenth Amendments by continuing to confine him on death row even though his death sentence had been vacated. He requested damages, as well as injunctive and declaratory relief. Defendants denied these claims and argued that they were entitled to qualified immunity.

Defendants filed a motion for summary judgment and Porter filed a partial motion for summary judgment. The Magistrate Judge granted Defendants' motion.[1] The Magistrate Judge decided that: 1) *Williams* does not give Porter a procedural due process interest in avoiding solitary confinement because Porter's death sentence remains active; 2) Porter has not offered evidence of actual injury or

---

[1] The parties consented to the jurisdiction of the Magistrate Judge. *See Porter v. Penn. Dep't of Corrs.*, 2:17-cv-763, ECF Nos. 3, 17; *see also* 28 U.S.C. § 636(c).

5

Defendants' deliberate indifference so he cannot succeed on an Eighth Amendment claim; and 3) Porter cannot make a substantive due process claim based on the same allegations at issue in his Eighth Amendment claim. The Magistrate Judge did not reach the merits of Defendants' qualified immunity defense.

### B.     *Factual Background*

Porter has been in solitary confinement on death row for more than thirty-three years. The Magistrate Judge summarized the conditions that Porter is subjected to daily as follows:

> Cells in the CCU are no larger than 7 feet by 12 feet, and are closed with a door that has two narrow vertical windows, measuring 5 ½ inches wide and 36 inches long. The permanent fixtures in Porter's cell include a metal bed with a plastic mattress, a sink, toilet and desk.
>
> As a CCU inmate, Porter spends the overwhelming majority of his time in his cell, including eating his meals alone. Porter is permitted to leave his cell for ten hours per week, two hours per day Monday through Friday. This includes time for basic hygiene, three showers per week, and for work duty. In addition, Porter is permitted to exercise in the open air five days per week. CCU exercise cages are no more than twice the size of a typical CCU cell, and one or two men are placed in an exercise area at the same time. Porter is permitted one non-contact

6

personal visit per week, and three telephone calls per week. In addition, unless Porter specifically requests a mental health appointment, any medical or mental health consultations take place through his cell door, within listening range of prisoners in the surrounding cells.

On the occasions when Porter is permitted to leave his cell, he must undergo a visual strip search, and is handcuffed from behind, or handcuffed in front using a belt and tether. Job assignments are limited to janitorial duties on the CCU block, and performed in confined small spaces under close observation and monitoring. CCU prisoners are permitted in-cell study, using personal workbooks and reading material, but are otherwise precluded from participation in adult basic education courses, vocational learning opportunities or the chance to work towards a high school diploma. In addition, Porter is not permitted to attend religious services with the general population, but may receive a daily visit from a religious leader, for discussions through the narrow windows of his door.

*Porter v. Penn. Dep't of Corrs.*, 2018 WL 5846747, at *3–4 (W.D. Pa. Nov. 8, 2018) (internal record citations omitted). The parties agree that Porter has been subjected to these conditions throughout his confinement. It is also uncontested that Porter has not received any disciplinary infractions during his incarceration. However, the parties agree that he is unable

7

to challenge his placement in solitary confinement or to earn any additional privileges.

In his Complaint, Porter alleged that his solitary confinement has caused "irreversible damage" to his mental health. JA 41. More specifically, he alleged that the effects of his solitary confinement include "severe anxiety, depression, panic, paranoia, bipolar mood swings, and at sometimes [sic] suicidal impulses. Plaintiff regularly takes depression medication." JA 41.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over Porter's 42 U.S.C. § 1983 suit under 28 U.S.C. § 1331. We have jurisdiction over Porter's appeal under 28 U.S.C. § 1291. We conduct a plenary review of the grant of summary judgment. *See Williams*, 848 F.3d at 557. Summary judgment should only be granted where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We draw all reasonable inferences in the nonmovant's favor. *See Williams*, 848 F.3d at 557.

## III. DISCUSSION

Porter argues that his thirty-three year incarceration in solitary confinement violates his procedural due process, Eighth Amendment, and substantive due process rights. He has brought suit under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff [(1)] must allege the violation of a right secured by the Constitution and laws of the United States, and [(2)] must show that the alleged deprivation was

committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citing *Parrat v. Taylor*, 451 U.S. 527, 535 (1981)). Defendants argue that they have not violated Porter's constitutional rights and that they are entitled to qualified immunity because the rights at issue were not clearly established.

Because we are mindful that "it is often appropriate and beneficial to define the scope of a constitutional right" to "promote[] the development of constitutional precedent" before deciding whether the right was clearly established, we will begin by evaluating whether Defendants have violated Porter's constitutional rights. *Williams*, 848 F.3d at 558 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### A.    *Procedural Due Process*

Porter first argues that, according to our precedent in *Williams*, Defendants have violated his procedural due process rights by keeping him in solitary confinement for thirty-three years without any regular, individualized determination that he needs to be in solitary confinement, even though he has been granted a resentencing hearing. We agree.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property . . . . A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted). "To establish [a state-created liberty interest under the Fourteenth Amendment] in the conditions of confinement context, courts generally require

9

a showing that the alleged liberty interest is substantial. To rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which . . . imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life.'" *Williams*, 848 F.3d at 559 (quoting *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997)) (alteration and emphasis in original).

*Williams* governs Porter's procedural due process claim. In *Williams*, we held that inmates who have been granted resentencing hearings have a due process liberty interest in avoiding indefinite detention in solitary confinement. *Id.* at 559–65. Given the scientific consensus on the severe detrimental impacts of prolonged solitary confinement, we decided that the plaintiffs' indefinite placements on death row constituted extreme deprivation and that these conditions were atypical in comparison with conditions in the general prison population. *Id.* We held that the employees of the Pennsylvania Department of Corrections (the "DOC") had violated the plaintiffs' procedural due process rights by keeping them in solitary confinement after their death sentences were vacated without any individualized determinations that would justify such extreme deprivations.[2] *Id.*

---

[2] In *Williams*, we did not decide whether inmates who have not been granted resentencing hearings and vacatur have a procedural due process interest in avoiding continued solitary confinement. *See Williams*, 848 F.3d at 552 n.2 (stating that the Court "take[s] no position on whether any inherent risk posed by inmates whose death sentences are still active and viable is sufficient to raise a presumption that their continued confinement on death row is justifiable."). We need not do so

10

The plaintiffs in *Williams* were, like Porter, originally sentenced to death in Pennsylvania state court. They were granted vacatur of their death sentences and resentencing hearings on PCRA review. However, the Pennsylvania courts denied their challenges to their underlying convictions. The plaintiffs appealed those denials. Their resentencing hearings were delayed while these appeals were pending. Because there was a possibility that they could be resentenced to death, the DOC kept the *Williams* plaintiffs in the CCU. This decision to maintain their solitary confinement pending resentencing was the basis for their procedural due process challenge.

Here, we are tasked with applying *Williams*. Porter's circumstances are analogous to those of the *Williams* plaintiffs. He too received a resentencing hearing in post-conviction review. Like the *Williams* plaintiffs, he appealed the district court's denial of relief on his guilt-phase habeas claims. His resentencing has similarly been delayed pending resolution of the appeals. Moreover, he has spent significantly more time in solitary confinement than the *Williams* plaintiffs. He has spent thirty-three years total in the CCU, sixteen of which were after he was granted relief in the habeas proceedings.

We are mindful that there are some distinctions between the *Williams* plaintiffs and Porter. In the view of Defendants, the most significant difference is that the Commonwealth appealed the District Court's vacatur order; it did not do so in the cases of the *Williams* plaintiffs. In addition, since Porter

today. Porter does not have an "active and viable" death sentence; like the *Williams* plaintiffs, he has been granted vacatur and a resentencing hearing but is languishing in solitary confinement while other litigation is pending. *Id.*

11

was granted habeas relief in federal court (rather than through PCRA proceedings in state court), an EDPA local rule stayed the vacatur order pending the resolution of the appeals.

But we do not think that these differences distinguish Porter for the purposes of his procedural due process rights. In *Williams*, we specifically held that the procedural due process right attaches for death row inmates whose sentences have been "vacated," which we defined as "situations where a defendant has initially been sentenced to death, but has subsequently been granted a new sentencing hearing." *Id.* at 553 n.4. This describes Porter's circumstances precisely: like the *Williams* plaintiffs, Porter was initially sentenced to death, but he has been granted a new sentencing hearing.

We are unconvinced by the Magistrate Judge's reliance on the Supreme Court's articulation of the legal impact of a stay in *Nken v. Holder*, 556 U.S. 418 (2009). In *Nken*, an immigration case, the Court held that traditional stay factors govern a court of appeals' authority to stay an alien's removal pending judicial review. Explaining the distinction between a stay and an injunction, the Court stated that "[a] stay does not make time stand still, but does hold a ruling in abeyance to allow an appellate court the time necessary to review it." *Id.* at 421. A stay pending appeal "temporarily suspend[s] the source of the authority to act—the order or judgment in question" and "suspend[s] judicial alteration of the status quo." *Id.* at 428–29.[3]

---

[3] Our dissenting colleague characterizes our disagreement with the Magistrate Judge's reliance on the stay as an "assertion that the habeas court's stay of the vacatur order accomplished nothing, and that Porter's death sentence was

12

That the order granting Porter vacatur and a resentencing hearing is stayed does not mean that the order has no legal import or that Porter currently has a viable death sentence. Porter, like the *Williams* plaintiffs, is in limbo: he may not be resentenced until his appeals are resolved.

Nor are we convinced by Defendants' argument that the Commonwealth's appeal meaningfully distinguishes Porter's case. Pursuant to the EDPA Local Rule and the District Court's order, the vacatur and resentencing order would have been stayed *if either party* appealed. In other words, if the Commonwealth had decided not to appeal (as it did for the *Williams* plaintiffs) but Porter decided to appeal his guilt-phase claims, the order would still have been stayed. The Commonwealth's appeal did not result in the stay of the vacatur order, and Defendants have not offered any other reason why the Commonwealth's appeal meaningfully differentiates Porter's case from *Williams*.

We do not see any other relevant distinguishing features. In both cases, the plaintiffs could end up with an active death sentence. The *Williams* plaintiffs could have been resentenced to death in their resentencing hearings, at which point the DOC would have returned them to the CCU. Indeed,

---

actually vacated." Dissenting Op. at 5. Not so. The stay certainly has legal effect: as a result of the stay, Porter cannot be resentenced. But the stay does not mean that Porter, for purposes of his procedural due process rights, is identical to other death row inmates who have never received any relief and have no imminent prospect of resentencing. Like the *Williams* plaintiffs, Porter *has received relief*—that relief is simply stayed pending appeal.

13

as described above, this was the Department's argument for keeping the *Williams* plaintiffs on death row: the Department argued that it was not permitted to remove the plaintiffs from death row until their death sentences had "actually been modified," which they had not, since it was possible that they would again receive the death penalty in their resentencing hearing. 949 F.3d at 557. We rejected that argument in *Williams*. Like the *Williams* plaintiffs, Porter could ultimately return to death row either as a result of his resentencing hearing or if the Third Circuit reverses the grant of habeas relief. A possible return to death row, therefore, does not distinguish Porter from *Williams*.

Nor can the difference be that Porter's resentencing has been delayed while other litigation in his case remains pending, for that was also true of the *Williams* plaintiffs. Their resentencing hearings were delayed six and eight years respectively during their appeals. The Commonwealth is presented with the same prolonged uncertainty about Porter's ultimate sentence that it experienced with the *Williams* plaintiffs. Nevertheless, extended delays and the attendant uncertainty do not justify Porter's continued solitary confinement without review.

Nor have Defendants identified any penological need for solitary confinement for Porter or inmates in Porter's position that do not apply to the *Williams* plaintiffs. In particular, the Commonwealth's stated interest in keeping inmates with death sentences in solitary confinement because they pose an increased safety risk is as applicable to the *Williams* plaintiffs as to Porter. These inmates may or may not end up back on death row after resentencing and/or disposition of their appeals. If the possibility of death row means that they

14

have "nothing left to lose" and are therefore more dangerous, that concern was as true of the *Williams* plaintiffs. On the flip side, Porter is as likely as the *Williams* plaintiffs to be on good behavior since he could be resentenced to a lesser penalty.

Finally, to the extent that Defendants contend that Porter is responsible for the delays in his resentencing, we squarely rejected such an argument in *Williams*. There too the Commonwealth argued that, by filing their appeals, the plaintiffs were responsible for their continued incarceration on death row. We found this argument "both meritless and disappointing. Plaintiffs' exercise of their rights to appellate review is simply irrelevant to our assessment of the constitutionality of their conditions of confinement." *Williams*, 848 F.3d at 561 n.2. The same reasoning applies to Porter's decision to exercise his state PCRA rights in state court. Porter's exercise of his rights (and the Commonwealth's exercise of its right to appeal) do not bear on our procedural due process analysis.

Our decision is thus a straightforward application of *Williams*. As in *Williams*, Defendants must provide Porter with "regular and meaningful review of [his] continued placement on death row," including "a statement of reasons for the continued placement," "meaningful opportunity to respond to the reasons provided," and a hearing. *Williams*, 848 F.3d at 576 (emphasis omitted).[4]

---

[4] Porter makes an alternative claim that, even if *Williams* does not apply, his individual term of solitary confinement constitutes an atypical and significant hardship that gives rise to a due process liberty interest regardless of the status of his death sentence. Because we conclude that

15

### B.     *Eighth Amendment*

Porter also argues that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to solitary confinement for thirty-three years.  Notably, Porter is not making a broader claim that the conditions for all death row inmates violate the Eighth Amendment; he makes only an as-applied challenge based on his own conditions of confinement.[5]

The Magistrate Judge denied Porter's Eighth Amendment claim on the ground that Porter had failed to establish that "both Defendants were individually aware that Porter suffered a substantial risk of harm and yet were deliberately indifferent."  *Porter*, 2018 WL 5846747, at *14.  The Magistrate Judge found that Porter did not provide any

---

*Williams* squarely governs Porter's case, we will not reach this argument.

[5] Our dissenting colleague takes issue with Porter's articulation of his Eighth Amendment claim and argues that Porter is not, in fact, making an as-applied challenge, but is rather repackaging his procedural due process claim.  Dissenting Op. at 12.  But Porter clearly articulated the duration and severity of his individual circumstances in solitary confinement in his complaint.  Moreover, at the time of the drafting of the complaint, Porter was *pro se*, and "[t]he obligation to liberally construe a *pro se* litigant's pleadings is well-established."  *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).  We are therefore unconvinced that his Eighth Amendment claim is "analytically identical to his procedural process claim."  Dissenting Op. at 13.

evidence of his "alleged mental decomposition" or that "either of the Defendants were aware that the care afforded or available was insufficient so as to place Porter at risk of further decline." *Id.* We disagree.

To determine whether prison officials have violated the Eighth Amendment, we apply a two-prong test: (1) the deprivation must be "objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities"; and (2) the prison official must have been "deliberate[ly] indifferen[t] to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations and quotation marks omitted). An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. Whether conditions constitute "cruel and unusual punishment" is measured against "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

### 1. Whether Porter's Deprivations Were Sufficiently Serious

To satisfy the objective prong of this test "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (quoting *Farmer*, 511 U.S. at 834). "The proof necessary to show that there was a substantial risk of harm is less demanding than the proof needed to show that there was a probable risk of harm." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 227 (3d Cir. 2015).

17

The Magistrate Judge did not apply the correct standard here. The Magistrate Judge decided that Porter failed to satisfy the objective prong in part because he did not offer evidence that he had experienced an actual injury. *See Porter*, 2018 WL 5846747, at \*14 ("[N]owhere in the record before this Court has Porter provided any evidence whatsoever of his alleged mental decomposition."). But an inmate need not provide evidence of actual injury. We have specifically held that the inmate need only offer evidence that there was a "substantial risk of serious harm." *Mammana*, 934 F.3d at 373.

It is well established in both case law and scientific and medical research that prolonged solitary confinement, like that experienced by Porter, poses a substantial risk of serious psychological and physical harm:

> A comprehensive meta-analysis of the existing literature on solitary confinement within and beyond the criminal justice setting found that "[t]he empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage." Specifically, based on an examination of a representative sample of sensory deprivation studies, the researchers found that virtually *everyone* exposed to such conditions is affected in some way. They further explained that "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative

18

psychological effects." And as another researcher elaborated, "all [individuals subjected to solitary confinement] will . . . experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli."

Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results. Additional studies included in the aforementioned meta-analysis further "underscored the importance of social contact for the creation and maintenance of 'self.'" In other words, in the absence of interaction with others, an individual's very identity is at risk of disintegration.

. . .

As if psychological damage was not enough, the impact of the deprivation does not always stop there. Physical harm can also result. Studies have documented high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement. These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation. In addition, the lack of opportunity for free movement is associated with more general physical

> deterioration. The constellations of symptoms
> include dangerous weight loss, hypertension, and
> heart abnormalities, as well as the aggravation of
> pre-existing medical problems.

*Williams*, 848 F.3d at 566–68 (internal citations omitted) (alterations in original); *see also* Brief of Amici Curiae Professors and Practitioners of Psychiatry, Psychology, and Medicine at 1 ("[S]olitary confinement causes substantial harm to prisoners' mental and physical health. For prisoners subject to extreme lengths of solitary confinement, such as Appellant Porter here, such harm is inevitable.").

We have repeatedly recognized the severe effects of prolonged solitary confinement, as have our sister circuits and Justices of the Supreme Court. *See Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (noting that a special assistant to the Secretary of the Pennsylvania DOC would be concerned about the psychological damage to an inmate after only 90 days of solitary confinement); *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (acknowledging the "robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); *Porter v. Clarke*, 923 F.3d 348, 355–56 (4th Cir. 2019) (holding that conditions on Virginia's death row violated the Eighth Amendment and noting that "[i]n recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions"); *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years

20

on end of near-total isolation exact a terrible price."); *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting) (reviewing literature and stating that "it is well documented that such prolonged solitary confinement produces numerous deleterious harms"). This consensus makes plain that a reasonable jury could conclude that thirty-three years in solitary confinement posed a substantial risk of harm to Porter.

Porter has also provided competent evidence that he has, in fact, experienced severe detrimental effects from his prolonged solitary confinement. In his sworn complaint, he stated that "the effects suffered from long-time solitary confinement, include, but are not limited to: severe anxiety, depression, panic, paranoia, bipolar mood swings, and at sometimes [sic] suicidal impulses. Plaintiff regularly takes depression medication." JA 41. We "consider as affidavits [Plaintiff's] sworn verified complaints, to the extent that they are based upon personal knowledge and set out facts that would be admissible in evidence." *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 100 n.1 (3d Cir. 2017) (citing Fed. R. Civ. P. 56(c)(4) & *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985)). The verified complaint was part of the record before the Magistrate Judge; Defendants have acknowledged that the Magistrate Judge was obligated to consider the verified complaint in deciding the motions for summary judgment. *See* Oral Arg. Recording at 1:00:22-25. Porter thus provided sufficient evidence of both serious harm and the substantial risk of harm to survive summary judgment.[6]

---

[6] In a post-oral argument 28(j) letter, Defendants have argued that Porter was required to present expert medical testimony to satisfy the objective prong of the Eighth Amendment test. They cite *Pearson v. Prison Health Service*,

21

Defendants' arguments to the contrary are unavailing. Defendants rely primarily on our decision in *Peterkin v. Jeffes*, 855 F.2d 1021 (3d Cir. 1988) to argue that Porter's solitary confinement does not give rise to an Eighth Amendment violation. In *Peterkin*, we held that a class of fifteen prisoners on death row in Pennsylvania "ha[d] not established that the totality of the conditions of their confinement constitutes cruel and unusual punishment." *Id.* at 1022. Defendants argue that *Peterkin* controls this case.

We disagree. Although many of the current conditions in the CCU are the same as or similar to those at issue in *Peterkin*,[7] there are key differences between the cases. First,

_____

850 F.3d 526 (3d Cir. 2017), for this proposition. But *Pearson* was an adequacy of care case. We held that medical testimony may be necessary to satisfy the *subjective* prong of the Eighth Amendment test in such cases: "[W]e think that medical expert testimony may be necessary to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care." *Id.* at 536. This is not the situation here.

[7] Death row inmates were housed at two facilities when *Peterkin* was decided. 855 F.2d at 1026. The conditions varied slightly at the two facilities. The conditions similar to Porter's include: confinement in individual cells for approximately twenty-two hours a day; cells between sixty and seventy-one square feet; showers three times a week or on alternate days; telephone calls either once a week or once a month; noncontact visits once a week; work programs in the form of janitorial tasks on death row; access to educational materials in the cells

22

Porter is making an as-applied Eighth Amendment challenge to his specific conditions of confinement; in contrast, *Peterkin* was a class action making a facial challenge to death row conditions generally. Our decision in Porter's case would not determine that the Commonwealth's death row procedures and policies are facially unconstitutional. As Defendants acknowledged at oral argument, the fact that *Peterkin* was a facial challenge distinguishes the case. *See* Oral Arg. Recording at 58:48-52.[8]

---

only; access to medical and psychological professionals in the cells; and exercise either individually or with one companion in enclosed exercise spaces. *Peterkin*, 855 F.2d at 1026–29, 1031.

[8] Our dissenting colleague disagrees that this posture distinguishes Porter's case. Dissenting Op. at 14. For that proposition, he relies on *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), where the Supreme Court held that in all Eighth Amendment method-of-execution claims, including both facial challenges and as-applied challenges, a prisoner must show a feasible alternative method of execution. Rejecting Bucklew's argument that he should not be required to show an alternative in an as-applied challenge, the Court stated that "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy, but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Id.* at 1127 (internal quotation marks omitted). The dissent seems to believe that we are relying on a different "substantive rule of law" in recognizing a distinction between Porter's situation and that of the *Peterkin* class. Not so. In both cases, the Eighth Amendment standard

23

Second, Porter has spent substantially more time in solitary confinement on death row than the *Peterkin* plaintiffs. The maximum amount of time that any of the *Peterkin* plaintiffs had spent on death row at the time of the lawsuit was four years. *Id.* at 1029 ("The district court found that some of the prisoners had already been on death row for four years."). Porter's duration of confinement is *more than eight times* as long. Given the consensus in the research and caselaw that prolonged solitary confinement is highly detrimental to an inmate's physical and mental health, that Porter has been in isolation for more than three decades sharply distinguishes the Eighth Amendment calculus here.

Third, and finally, the research and caselaw have advanced considerably since we decided *Peterkin* in 1988. *See, e.g.*, *Porter*, 923 F.3d at 358–59 (clarifying that *Porter* does not overrule past precedent because it was decided on a different set of facts, including that the plaintiffs in *Porter* introduced expert reports detailing the risks of solitary confinement with studies that are more recent than those that were available in the prior case).

---

is the same: to satisfy the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). While the class in *Peterkin* was not able to meet this standard based on the conditions that affected the class as a whole, Porter is able to meet this standard because of his particular circumstances. There is no difference in the substantive rule of law, only whether Porter has shown a deprivation in his particular case.

Because of these differences, *Peterkin* is not controlling here. Porter has been subjected to more than thirty-three years in solitary confinement. That extreme duration of solitary confinement has had severe detrimental impacts on Porter, impacts that track the robust and growing scientific and legal understanding of the harms of prolonged solitary confinement. Viewing Porter's deprivations according to "contemporary standards of decency," *Estelle*, 429 U.S. at 103, Porter has certainly provided enough evidence to survive summary judgment.

2.     Whether Defendants Knew of and Disregarded the Risk to Porter

To satisfy the subjective prong of the Eighth Amendment test, an inmate must show that the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Chavarriaga*, 806 F.3d at 229 (quoting *Farmer*, 511 U.S. at 847) (quotation marks omitted). The inmate "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that defendants must have known about the risk." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010) (quoting *Farmer*, 511 U.S. at 842–43) (internal quotation marks omitted).[9]

_____

[9] Our dissenting colleague cites 61 Pa. Cons. Stat. § 4303 several times, including for the proposition that our "entire discussion of the subjective prong is ill-considered." Dissenting Op. at 24. Under § 4303, the Pennsylvania Department of Corrections must keep an inmate sentenced to

25

Defendants have acknowledged the risks of prolonged solitary confinement. In a past case, Defendant Wetzel conceded that long-term solitary confinement poses serious risks: "Secretary Wetzel agreed that 'long term' solitary confinement 'certainly could' have negative effects on mental health and that Johnson's thirty-six year confinement is 'certainly' considered long term. . . . Moreover, Secretary Wetzel stated that he is familiar with the work of Dr. Haney, which sets forth at length the harmful effects of solitary

_____

death in solitary confinement until infliction of the death penalty or discharge "[u]pon receipt of the warrant." 61 Pa. Cons. Stat. § 4303. The "warrant," which is issued by the Governor, specifies a day for execution "which shall be no later than 60 days after the date the warrant is signed." § 4302(a)(1). Once the warrant has expired, however, "it is entirely a matter of the Department's discretion where to house an inmate." *Clark v. Beard*, 918 A.2d 155, 160 (Pa. Commw. Ct. 2007). According to Department of Corrections' website, the Governor of Pennsylvania has never issued an execution warrant for Porter. *See* Department of Corrections, Execution Warrants/Notices Issued by Governor (1985 to Present) https://www.cor.pa.gov/About%20Us/Initiatives/Documents/Death%20Penalty/Warrants.pdf (last visited June 25, 2020). Moreover, at oral argument, Defendants conceded that if there is an execution warrant for Porter that is not listed, it is null because the sixty days have run. Oral Arg. Recording at 48:16-46. The dissent's statement that "the citizens of Pennsylvania . . . have determined that [Porter] must remain in solitary confinement while on death row" is simply incorrect. Dissenting Op. at 23–24. Porter remains in the CCU as a matter of the Department of Corrections' discretion, not because of any statutory requirement.

26

confinement." *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016) (internal citation omitted). The record also reflects that Defendant Gilmore was aware that Porter had been in solitary confinement for more than three decades and was experiencing mental health problems: following our decision in *Williams*, Porter submitted a grievance and multiple appeals to the DOC, including to Defendant Gilmore. Moreover, the DOC's representative in this case, Steven Glunt, testified in his deposition about "potential decomposition" that affects death row inmates as a result of prolonged solitary confinement:

> [I]f you put [capital case inmates] in an environment where there's not an opportunity to be interactive, stimulate their thought processes, to grow . . . they start to decompensate. And then that increases their risk of self harm. That increases their risk of hurting others. . . . [Decompensate means] a person who is either emotional, physically, or mentally starting to withdraw, and they're starting to reduce their interaction with others. They're starting to literally, from an emotional and intellectual standpoint, shut down.

JA 199–200.

Furthermore, the substantial risks of prolonged solitary confinement are "obvious," "longstanding, pervasive, well-documented, [and] expressly noted by prison officials in the past." *Farmer*, 511 U.S. at 842 (holding that a factfinder can conclude that a prison official was aware of a serious risk if the risk was obvious). As we have emphasized, a wide range of researchers and courts have repeatedly described the serious

27

risks associated with solitary confinement. Moreover, correctional officers have publicly acknowledged these harms. As Porter highlights, Defendant Wetzel is the president of the Association of State Correctional Administrators ("ASCA"), which has published reports about efforts to limit solitary confinement.[10]

Finally, that DOC policies specifically recognize the mental health risks posed by solitary confinement supports Porter's argument that Defendants were deliberately indifferent. In the section on administrative custody ("AC"), the policies state: "If the inmate has a mental illness, the PRC [Program Review Committee] should explore the feasibility of

---

[10] *See* Association of State Correctional Administrators, Committees, https://www.asca.net/committees (last visited Nov. 14, 2019); *ASCA and Liman Center Release Two New Reports on Solitary Confinement*, Yale Law School (Oct. 10, 2018), https://law.yale.edu/yls-today/news/asca-and-liman-center-release-two-new-reports-solitary-confinement; Association of State Correctional Administrators & The Liman Center for Public Interest Law, *Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-in-Cell*, Yale Law School (Sept. 25, 2018), https://law.yale.edu/sites/default/files/documents/pdf/Liman/asca_liman_2018_restrictive_housing_revised_sept_25_2018_-_embargoed_unt.pdf; Association of State Correctional Administrators & The Liman Center for Public Interest Law, *Working to Limit Restrictive Housing: Efforts in Four Jurisdictions to Make Changes* (Sept. 25, 2018), https://law.yale.edu/sites/default/files/documents/pdf/Liman/asca_liman_2018_workingtolimit.pdf.

placing him/her into [other treatment units] as an alternative . . . ." JA 101. "A qualified psychologist or psychiatrist shall personally interview and conduct an assessment of any inmate remaining in AC status for more than 30 calendar days. If the inmate's confinement continues for more than 30 calendar days, a mental health assessment shall be completed at least every 90 calendar days." JA 106 (emphases omitted). As Glunt describes, staff working in the CCU are trained with "more advanced mental-health observation," including how to recognize symptoms of decompensation. JA 223. The DOC has thus openly recognized the substantial risk of serious mental harm that prolonged solitary confinement poses.[11]

In evaluating the subjective prong of the Eighth Amendment test, we may also consider whether officials "had a legitimate penological purpose" behind their conduct. *Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018); *see also Wood v. Beauclair*, 692 F.3d 1041, 1050 (9th Cir. 2012). The Eighth Amendment prohibits punishments without penological justification. *See Hope v. Pelzer*, 536 U.S. 730, 737 (2002). As a defense to Porter's Eighth Amendment claim, Defendants argue that they have a legitimate penological justification for keeping him in indefinite solitary confinement. Specifically,

---

[11] At oral argument, Defendants maintained that they were not deliberately indifferent because they provided enhanced mental health services to CCU inmates. *See* Oral Arg. Recording at 1:06:39-53. But the question in this case is not whether the mental health care afforded to Porter was constitutionally inadequate. A reasonable jury could conclude that Defendants have been deliberately indifferent to the substantial risk of serious harm by leaving Porter in solitary for more than thirty-three years.

Defendants argue that they keep inmates like Porter in solitary because capital inmates have "nothing left to lose." Answering Br. 27. However, Defendants have not offered any evidence about the risk that Porter specifically poses, or any individualized argument about Porter at all. Moreover, the DOC witness acknowledged in his deposition that the "nothing left to lose" argument is not entirely accurate; he testified that death row inmates like Porter have privileges that can be taken from them if they break any rules. It is also undisputed that Porter has not had any disciplinary infractions during his lengthy incarceration. We therefore do not find Defendants' argument on this point convincing.

In conclusion, we hold that a reasonable jury could find that Defendants know that prolonged solitary confinement has serious detrimental health impacts, but that they have disregarded the risk in Porter's case by leaving him in isolation for more than thirty-three years.[12]

---

[12] It scarcely needs saying that, in reaching this conclusion we do not "create[] for death-row prisoners like Porter a brand-new constitutional right to escape solitary confinement," as our dissenting colleague claims. Dissenting Op. at 8. To the contrary, our conclusion is based on: (1) our well-established case law stating that the standard for satisfying the objective prong of the Eighth Amendment is a substantial risk of serious harm; (2) the well-documented and oft-cited body of research and law recognizing the substantial risk posed by solitary confinement of such an extreme duration; (3) Porter's own articulation of the harm that he has experienced; and (4) Defendants' own recognition of the substantial risks that prolonged solitary confinement like that experienced by Porter poses. We do not hold that all inmates

30

### C. Substantive Due Process

Porter also argues that Defendants have violated his substantive due process rights under the Fourteenth Amendment. We hold that Porter's substantive due process claim is barred under the more-specific-provision rule and affirm the District Court's grant of summary judgment on this claim.

The substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)). "[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'" *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994) (citation omitted).

Porter argues that his thirty-three year solitary confinement is conscience-shocking because Defendants have subjected him to "extreme social isolation" even though he has a perfect disciplinary record and they are aware of the psychological and physical consequences of prolonged isolation. Defendants argue that Porter cannot bring a separate substantive due process claim because his Eighth Amendment claim covers the same allegations under the more-specific-provision rule.

---

in solitary confinement or on death row have been subjected to an Eighth Amendment violation.

31

We agree with Defendants. The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125. Under the more-specific-provision rule, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). As the Supreme Court explained in *Whitley v. Albers*, 475 U.S. 312, 327 (1986):

> [T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified. It would indeed be surprising if, in the context of forceful prison security measures, "conduct that shocks the conscience" or "afford[s] brutality the cloak of law," and so violates the Fourteenth Amendment, were not also punishment "inconsistent with contemporary standards of decency" and "repugnant to the conscience of mankind," in violation of the Eighth . . . . [I]n these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause.

*Id.* at 327 (internal citations omitted).

32

We first applied the more-specific-provision rule in *Betts*, 621 F.3d at 260. There, the plaintiff alleged that prison officials violated his Eighth Amendment and substantive due process rights by permitting him to play tackle football without protective equipment. We noted that the plaintiff failed to "cite any case law for the proposition that he may bring both substantive due process and Eighth Amendment claims challenging the same conduct" and that his claims about his conditions of confinement and the officials' failure to ensure his safety "fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment." *Id.* at 261; *see also Wharton v. Danberg*, 854 F.3d 234, 246 (3d Cir. 2017) (affirming district court's dismissal of substantive due process claims that were parallel to Eighth Amendment claims under the more-specific-provision rule).

Porter submits that the claims are distinct because on his substantive due process claim, he is arguing that Defendants "have violated that constitutional right by engaging in conduct that shocks the conscience *irrespective* of any procedural safeguards, unreasonable risk, or penological purpose." Opening Br. 46–47. But we do not see a distinction here. As in *Betts*, Porter's substantive due process claim challenges the same conduct as his Eighth Amendment claim, namely, his prolonged solitary confinement. There are no distinct facts that apply only to his substantive due process claim. We therefore affirm the Magistrate Judge's grant of summary judgment on Porter's substantive due process claim.

33

## D. *Qualified Immunity*

Finally, we must decide whether Defendants have qualified immunity from Porter's constitutional claims.[13] Because the Magistrate Judge found that Defendants did not violate Porter's constitutional rights, she did not reach this affirmative defense. Since we disagree with the Magistrate Judge on the procedural due process and Eighth Amendment claims we will do so. *See Kabakjian v. United States*, 267 F.3d 208, 213 (3d Cir. 2001) ("We may affirm a judgment on any ground apparent from the record, even if the district court did not reach it.").

We apply a two-part test to qualified immunity defenses: "We first determine whether a right has been violated. If it has, we then must decide if the right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful." *Williams*, 848 F.3d at 557. To determine whether the right was clearly established, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general

___

[13] Porter contends that Defendants have arguably waived the defense of qualified immunity on his Eighth Amendment claims because they did not raise it in their motion for summary judgment. We disagree. Defendants did properly raise qualified immunity as a defense in their Answer to Porter's Complaint and in their Response to Porter's Motion for Summary Judgment on his procedural due process claim. Their Response to Porter's Motion for Summary Judgment did not need to include qualified immunity with respect to the Eighth Amendment because Porter did not move for summary judgment on this claim.

34

proposition. . . ." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001) (receded from on other grounds by *Pearson*, 555 U.S. 223). In some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Hope*, 536 U.S. at 741 (2002) (quoting *Lanier*, 520 U.S. at 271) (brackets in original) (internal quotation marks and citation omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances" as long as the law gives the officials "fair warning" that their treatment of the inmate is unconstitutional. *Id.*

We look to the Supreme Court, our Circuit, and our sister circuits to determine whether a right is clearly established:

> In conducting the inquiry into whether a right is clearly established, we look first for applicable Supreme Court precedent. If none exists, we consider whether there is a case of controlling authority in our jurisdiction or a robust consensus of cases of persuasive authority in the Courts of Appeals that could clearly establish a right for purposes of qualified immunity.

*Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (internal citations, quotation marks, and alterations omitted).

35

1. Porter's Procedural Due Process Claim

Because Porter's procedural due process rights have been clearly established since we decided *Williams* in 2017, Defendants are not entitled to qualified immunity on this claim. In *Williams*, we explicitly stated:

> Our holding today that Plaintiffs had a protected liberty interest provides "fair and clear warning" that, despite our ruling against Plaintiffs, qualified immunity will not bar such claims in the future. As we have explained, scientific research and the evolving jurisprudence has made the harms of solitary confinement clear: Mental well-being and one's sense of self are at risk. We can think of few values more worthy of constitutional protection than these core facets of human dignity.

848 F.3d at 574 (quoting *Lanier*, 520 U.S. at 271).

We were not alone in reaching this conclusion. *See Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (holding that inmate who had been in administrative segregation for over ten years had a due process liberty interest in avoiding continued isolation); *Incumaa v. Stirling*, 791 F.3d 517, 531–32 (4th Cir. 2015) (holding that an inmate who spent twenty years in solitary confinement had a due process liberty interest in avoiding solitary confinement); *Wilkerson v. Goodwin*, 774 F.3d 845, 857–58 (5th Cir. 2014) (denying a qualified immunity defense to prison officials on a procedural due process claim brought by an inmate who had been in solitary confinement for thirty-nine years and stating that "no

36

reasonable prison official could conclude that continuing four decades in indefinite solitary confinement would not implicate a liberty interest protected by due process"); *Brown v. Ore. Dep't of Corrs.*, 751 F.3d 983, 987–88 (9th Cir. 2014) (holding that an inmate who spent twenty-seven months in solitary confinement had a due process liberty interest in avoiding further solitary confinement); *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (holding that an inmate who spent thirteen years in solitary confinement had a due process liberty interest); *Magluta v. Samples*, 375 F.3d 1269, 1277–80 (11th Cir. 2004) (holding that an inmate who spent more than five hundred days in solitary confinement stated a claim for a procedural due process violation); *Hanrahan v. Doling*, 331 F.3d 93, 99 (2d Cir. 2003) (affirming the denial of qualified immunity to prison officials on a procedural due process claim brought by an inmate who had been sentenced to solitary confinement for ten years); *Colon v. Howard*, 215 F.3d 227, 231–32 (2d Cir. 2000) (holding that solitary confinement for 305 days gave rise to a due process liberty interest).

There is therefore wide consensus that prolonged and indefinite solitary confinement gives rise to a due process liberty interest for inmates in Porter's circumstances. These cases gave Defendants "fair warning" that keeping an inmate who has been in solitary confinement for thirty-three years on death row while appeals of his vacatur order proceed violates his procedural due process rights. Defendants therefore are not entitled to qualified immunity as of our decision in *Williams*.

### 2. Porter's Eighth Amendment Claim

On Porter's Eighth Amendment claim, however, we reach a different conclusion. Unlike his procedural due

37

process rights, Porter's Eighth Amendment right has not been clearly established. Porter has correctly pointed out that our Circuit and our sister circuits have held that inmates can bring Eighth Amendment claims based (at least in part) on conditions in solitary confinement. But only one circuit has done so in connection with solitary confinement on death row. Cases that challenge interpretation of death row policy and conditions on death row are distinct from cases brought by inmates in general population subject to solitary confinement. In *Williams*, for example, we considered whether our decision in *Shoats*, 213 F.3d 140, was sufficiently similar to the facts and claims raised by the *Williams* plaintiffs. We decided that, although *Shoats* is analogous and should have "raised concerns" about whether the treatment of the *Williams* plaintiffs was constitutional, it was not sufficiently similar because Shoats was not on death row and did not directly dispute the death row isolation policy at issue in *Williams*. *See Williams*, 848 F.3d at 572.

We have not found Eighth Amendment cases with sufficiently similar fact patterns, and the cases that Porter cites in support of his argument are inapposite. In particular, Porter's reliance on *Palakovic*, 854 F.3d 209 is unavailing. In that case, the plaintiff had committed suicide in solitary confinement. He was not on death row. The plaintiff's family alleged that he had preexisting serious mental health problems that the prison had diagnosed. Even so, prison officials repeatedly placed him in solitary confinement. Considering the plaintiff's particular vulnerability in light of the known dangers of solitary confinement, we held that the plaintiff had stated an Eighth Amendment claim. *Id.* at 225–26. Although the *Palakovic* decision certainly acknowledges the dangers of solitary confinement, that the plaintiff was not on death row and had specific known mental health issues pre-assignment to

38

solitary confinement distinguishes *Palakovic* from Porter's case.

We similarly find Porter's reference to *Allah v. Bartkowski*, 574 F. App'x 135 (3d Cir. 2014) (unpublished), unconvincing. Aside from the not precedential status of *Allah*, which renders it useless as precedent, that case focused on sleep deprivation and unsanitary conditions in solitary confinement, neither of which are at issue in Porter's case. *Id.* at 138–39. Nor are the cases Porter cites from other circuits sufficiently on point. They do not concern death row and, in each case, the inmate made specific allegations in addition to placement in solitary confinement that gave rise to a potential Eighth Amendment violation. *See Rice ex rel. Rice v. Corr. Med. Srvs.*, 675 F.3d 650, 666–67 (7th Cir. 2012) (noting in dicta that the court has previously recognized that prolonged confinement in solitary may constitute a violation of the Eighth Amendment depending on duration, nature and need for the confinement, but dismissing the Eighth Amendment claim in the case and noting that past cases involved other deprivations in addition to confinement in solitary); *Fogle v. Pierson*, 435 F.3d 1252, 1259–60 (10th Cir. 2006) (holding that an inmate in administrative segregation made an arguable Eighth Amendment claim when he alleged that he was denied outdoor exercise for three years); *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) (an inmate in solitary confinement stated a claim for an Eighth Amendment violation based on his allegations that he was subjected to a lack of outdoor exercise, constant loud noise, bad ventilation, constant illumination, poor sanitation, and spoiled food and foul water); *Walker v. Shansky*, 28 F.3d 666, 672–73 (7th Cir. 1994) (holding that a jury could conclude that the plaintiff's prolonged solitary confinement together with his other allegations of deprivations

and abuse, including denial of water for up to a week, repeated physical abuse, and denial of sufficient exercise time, violated the Eighth Amendment); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972) (holding that an inmate made an Eighth Amendment claim based on a five day stay in a strip cell, but focusing on the fact that the cell was in continuous darkness and the inmate was unable to maintain his personal cleanliness).

The Fourth Circuit has held that solitary confinement conditions on death row violate the Eighth Amendment. *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019). But a single out-of-circuit case is insufficient to clearly establish a right. Defendants are therefore entitled to qualified immunity on Porter's Eighth Amendment claim.

We emphasize, however, that from this point forward, it is well-established in our Circuit that such prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where, as here, Defendants have failed to provide any meaningful penological justification.

## IV. CONCLUSION

For the foregoing reasons, we will reverse and remand in part and affirm in part. We reverse the Magistrate Judge's grant of summary judgment to Defendants on Porter's procedural due process claim. We affirm the grant of summary judgment to Defendants on Porter's Eighth Amendment claim, but on the ground that Defendants are entitled to qualified immunity because the right was not clearly established. We affirm the grant of summary judgment to Defendants on

40

Porter's substantive due process claim. Finally, we remand to the District Court to determine damages and declaratory and injunctive relief.[14]

---

[14] Defendants argue that Porter's requests for equitable relief are moot and/or abandoned. We disagree. Since the "effects of the alleged violation" have not been "completely eradicated," the claims are not moot. *Burns v. PA Dep't of Corrs.*, 544 F.3d 279, 283 (3d Cir. 2008) (quotation marks omitted). Nor has Porter abandoned the claims. Porter requested declaratory and injunctive relief in his Complaint. Defendants recognized that he was seeking injunctive relief in their motion for summary judgment. *See Porter v. Penn. Dep't of Corrs.*, 2:17-cv-763, Doc. 53, at 2 ("As relief, Porter is requesting that he be released from the CCU and placed in a General Population housing unit."). Likewise, the Magistrate Judge recognized that Porter was requesting equitable relief. *See Porter*, 2018 WL 5846747, at *5 ("Porter seeks declaratory relief."). Defendants have not pointed to any evidence that Porter has changed his originally requested relief.

PORTER, *Circuit Judge*, concurring in part and dissenting in part.

The majority incorrectly holds that Porter's solitary confinement violates his procedural due process rights. To reach that conclusion, the majority must shoehorn this case into the non-analogous holding of *Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549 (3d Cir. 2017). It accomplishes that only by ignoring Supreme Court precedent describing the nature of a judicial stay. The majority then strides into constitutional territory that the Supreme Court and our Court have assiduously avoided— holding that Defendants likely violated the Eighth Amendment by keeping Porter in solitary confinement. For these and other reasons, I respectfully dissent in part.

I concur in part because I agree with the majority that Porter's substantive due process claim is barred by the more-specific-provision rule. *See* Maj. Op. 31–33. Assuming for the sake of argument that Porter's Eighth Amendment rights were violated, I also agree that Defendants are entitled to qualified immunity.

# I

On April 27, 1986, Theodore Wilson a.k.a. Ernest Porter[1] robbed, shot, and killed Raymond Fiss at Fiss's Philadelphia beauty shop. *Commonwealth v. Porter*, 569 A.2d 942, 944 (Pa. 2012). A Pennsylvania jury convicted Porter of first-degree murder, robbery, and possessing a firearm. *Id.* at 943. The jury then sentenced Porter to death. *Id.* In accordance with state law, he was placed in solitary confinement. *See* 61 Pa. Cons. Stat. § 4303.[2]

The Supreme Court of Pennsylvania affirmed Porter's conviction and sentence. It also denied his two subsequent petitions for post-conviction relief. *See Commonwealth v.*

---

[1] State and federal courts have used Wilson's alias throughout all proceedings, and we follow suit. *See Porter v. Horn,* 276 F. Supp. 2d 278, 288 n.1 (E.D. Pa. 2003).

[2] The predecessor statute to 61 Pa. Cons. Stat. § 4303 was 61 Pa. Stat. § 3003.

1

*Porter*, 728 A.2d 890, 893 (Pa. 1999); *Commonwealth v. Porter*, 35 A.3d 4, 6 (Pa. 2012).

In 2000, Porter filed a petition for habeas corpus in the United States District Court for the Eastern District of Pennsylvania. On June 26, 2003, the District Court granted relief with respect to Porter's death sentence but denied the petition in all other respects. *Porter v. Horn*, 276 F. Supp. 2d 278, 288 (E.D. Pa. 2003). Porter and the government both appealed, triggering an automatic stay of the District Court's order vacating Porter's death sentence. *See* E.D. Pa. L.R. 9.4(12) (requiring the District Court, after granting a certificate of appealability in a habeas proceeding, to "grant a stay pending disposition of the appeal"). Seventeen years later, at Porter's request, his habeas appeal remains pending in abeyance before this Court. So he has continued to live in solitary confinement.

Porter commenced this action in 2017, alleging violations of three constitutional protections: (1) his procedural due process rights under the Fourteenth Amendment; (2) his substantive due process rights under the Fourteenth Amendment; and (3) his right to be free from cruel and unusual punishment under the Eighth Amendment. The parties filed cross-motions for summary judgment, and the District Court—correctly in my view—granted Defendants' motion on all three claims.

## II

The majority holds that Pennsylvania has violated Porter's procedural due process right to avoid continued solitary confinement. That holding turns on the majority's insistence that "*Williams* governs Porter's procedural due process claim." Maj. Op. 10. But by its own terms, *Williams* does not apply to this case. And without *Williams*, Porter's alleged protected liberty interest and procedural due process claim have no legal support.

In *Williams*, the plaintiffs were two Pennsylvania death-row inmates who were kept in solitary confinement by prison officials for six and eight years, respectively, *after their death sentences were vacated*. 848 F.3d at 554. The fact that the inmates remained in solitary confinement long after their death

2

sentences had been vacated is central to *Williams*'s holding,[3] and it permeates the entire opinion: Twenty-eight times we carefully noted that the inmates were kept in solitary confinement after their death sentences had been vacated.

In the section of *Williams* concluding that the inmates had a protected liberty interest, we emphasized that they remained in solitary confinement on death row for years "*after the initial justification for subjecting them to such extreme deprivation (their death sentences) ceased to exist*." *Id.* at 561 (emphasis added). Focusing on the indefinite nature of their solitary confinement, we said that their "confinement on death row *after their death sentences were vacated* continued for years with no ascertainable date for their release into the general population." *Id.* at 562 (emphasis added). And contrasting the plaintiffs with other inmates who were moved into and out of administrative segregation for behavioral reasons, we observed that they "would still have been relegated to death row indefinitely even though they had won new sentencing proceedings and were *not under active sentences of death*." *Id.* (emphasis added).

In another section of *Williams*, we distinguished cases holding that capital murder inmates do not have a liberty interest that precludes confinement on death row without regular review because "those inmates were all confined pursuant to death sentences *that had not been vacated*." *Id.* at 569 (emphasis in original) (distinguishing *Prieto v. Clarke*, 780 F.3d 245 (4th Cir. 2015); *Smith v. Coughlin*, 748 F.2d 783 (2d Cir. 1984); and *Parker v. Cook*, 642 F.2d 865 (5th Cir. 1981)). "Accordingly," we explained, "confinement on death row was not a significant or atypical hardship for them. Rather, it was expressly within the 'expected perimeters of the sentence imposed.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 485 (1995)). Because the *Williams* plaintiffs' death sentences *had been vacated*, their liberty interests were "not

---

[3] *See Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 570 (3d Cir. 2017) ("For the reasons we have discussed, we now hold that Plaintiffs had a due process liberty interest in avoiding the extreme sensory deprivation and isolation endemic in confinement on death row *after their death sentences had been vacated*." (emphasis added)).

3

comparable to those of inmates with active death sentences that arguably require continued placement on death row." *Id.* But if the fact of an active death sentence is what distinguished *Williams* from *Prieto*, *Smith*, and *Parker*, then it also distinguishes Porter's case from *Williams*.

Finally, in order to dispel any possible ambiguity we explicitly cabined *Williams*'s holding by refusing to extend it to "inmates whose death sentences are still active and viable." *Id.* at 552 n.2. That is, inmates like Porter.

## A

I belabor this point because Porter's solitary confinement (unlike the plaintiffs in *Williams*, but exactly like the capital murder inmates in *Prieto*, *Smith*, and *Parker*) is required by his still-active death sentence. As we noted in *Williams*, when a defendant is sentenced to death and the Governor issues a warrant for execution, the Department of Corrections "shall, until infliction of the death penalty or until lawful discharge from custody, keep the inmate in solitary confinement." 61 Pa. Cons. Stat. § 4303; *see Williams*, 848 F.3d at 554. That is, Pennsylvania's Prisons and Parole Code requires inmates with active death sentences to remain in solitary confinement until execution or lawful discharge from custody, which "would occur when the inmate's conviction is overturned or pardoned." *Clark v. Beard*, 918 A.2d 155, 160 (Pa. Commw. Ct. 2007). Porter has not been executed or lawfully discharged from custody. So his solitary confinement is not a significant or atypical hardship but fits squarely within the "expected perimeters of the sentence imposed." *Williams*, 848 F.3d at 569.

## B

The majority attempts to fit this case into *Williams*'s holding by asserting that "Porter's circumstances are analogous to those of the *Williams* plaintiffs." Maj. Op. 11. In fact, Porter's case differs from *Williams* on precisely the ground that that we took such pains to emphasize in *Williams*: He still has an active death sentence.

Porter's death sentence remains active because the habeas court's vacatur order was immediately stayed,

4

preserving the status quo. The majority brushes that aside, declaring that the stay "does not mean that the [vacatur] order has no legal import or that Porter currently has a viable death sentence." Maj. Op. 11. This is pure *ipse dixit*, and it is incorrect.

In *Nken v. Holder*, 556 U.S. 418 (2009), the Supreme Court described the nature and effect of a stay. As the Court explained, a stay is not a vague, legally meaningless pause in a judicial proceeding. For as long as the stay is in effect it "suspend[s] the source of authority to act—the order or judgment in question[.]" *Id.* at 428–29. Although a stay is functionally similar to an injunction, they "serve different purposes" and are analytically distinct in this important respect: The injunction operates *in personam*, telling a particular actor what it may or may not do; conversely, the stay "operates upon the judicial proceeding itself" and prevents "judicial alteration of the status quo." *Id.*

Here, the status quo that would have been judicially altered by the habeas court's vacatur order was Porter's active death sentence. But because the stay of that order "suspend[ed] judicial alteration of the status quo," *see id.* at 429 (citation omitted), Porter's death sentence was undisturbed and remains in place, uninterrupted, to this day.

This explication of *Nken*'s teaching about stays is utterly conventional. Following *Nken*, other circuit courts have similarly described stays as "preserv[ing] the status quo," *Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019), "suspend[ing] judicial alteration of the status quo," *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (citing *Nken*, 556 U.S. at 429), and "void[ing] any legal effect from the stayed judgment," *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, No. 2009-1427, 2009-1444, 2009 WL 7365766, at *2 (Fed. Cir. Aug. 13, 2009) (Moore, J., concurring in the denial of reconsideration) (referencing *Nken*). The majority's assertion that the habeas court's stay of the vacatur order accomplished nothing, and that Porter's death sentence was actually vacated, is unprecedented and flies directly in the face of *Nken*.[4] The

---

[4] The majority's unconventional stay doctrine also threatens to destabilize the appellate process and our local practice. *See*

5

critical distinction between *Williams* and this case cannot be evaded by pretending that the stay of the vacatur order was a legal nullity.

## III

Porter argues in the alternative that even if *Williams* does not apply, his solitary confinement is an atypical and significant hardship that creates a due process liberty interest. Because the majority holds that *Nken* does not apply and so *Williams* does, it declined to address this argument. Maj. Op. 15 n.4. But Porter's constitutional-liberty-interest argument is also a non-starter.

"The Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed." *Sandin*, 515 U.S. at 480 (internal quotation marks and citation omitted). Therefore, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242 (1976). So the baseline for a prisoner's allegation of atypical and significant hardship "is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." *Powell v. Weiss*, 757 F.3d 338, 344 (3d Cir. 2014) (citation omitted).

In *Sandin*, the plaintiff challenging his solitary confinement did not have a protected liberty interest because his detention in a segregated unit "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction." *Sandin*, 515 U.S. at 486. But inmates in long-term solitary confinement may have a protected liberty interest if they can show that, but for the discretionary decisions of

Fed. R. App. P. 8, 41(d); 3d Cir. L.A.R. 8.0, 18.0, 110.1, 111.4, 111.7 (2011). And it invites mischief in proceedings that routinely employ stays. *See e.g.*, 8 U.S.C. § 1252(f)(2) (immigration); 9 U.S.C. § 3 (arbitration); 11 U.S.C. § 362 (bankruptcy).

6

prison administrators, they would be in the general prison population. *Shoats v. Horn*, 213 F.3d 140, 143–44 (3d Cir. 2000). Their solitary confinement is thus "atypical" in relation to the ordinary incidents of prison life and differs significantly from "routine" prison conditions in Pennsylvania prisons. *Id.* at 144; *see also Williams*, 848 F.3d at 561 (noting that prison administrators continued plaintiffs' assignment on death row "after the initial justification for subjecting them to such extreme deprivation (their death sentences) ceased to exist"); *see also Wilkinson v. Austin*, 545 U.S. 209, 217 (2005) (explaining that plaintiffs were assigned to Ohio's Supermax facility upon the discretionary recommendation of a three-member committee, approved by prison warden and the Bureau of Classification, a body of "prison officials vested with final decisionmaking authority over all Ohio inmate assignments").

Porter does not fit within the category of prisoners described in *Shoats*, *Williams*, or *Wilkinson* because his solitary confinement was not discretionary. His death sentence carries with it the statutory requirement that he remain in solitary confinement until execution or discharge from custody. Because solitary confinement is "within the sentence imposed[,]" it is not atypical but exactly what Porter could reasonably expect as a result of his death sentence. *See Sandin*, 515 U.S. at 480 (citation omitted).

The majority contends that sixty days after the issuance of Porter's execution warrant, his housing status was left entirely to the discretion of Pennsylvania's Department of Corrections. Maj. Op. 25 n.9. That is not what the statute says. Pennsylvania law provides that within ninety days after a death sentence has been transmitted to the governor, he shall issue an execution warrant. 61 Pa. Cons. Stat. § 4302(a)(1). "Upon receipt of the warrant, the secretary shall, until infliction of the death penalty or until lawful discharge from custody, keep the inmate in solitary confinement." 61 Pa. Cons Stat. § 4303. These unambiguous statutory requirements are mandatory; they confer no discretion upon the Department of Corrections either before or after the expiration of sixty days.

The Commonwealth Court's decision in *Clark* emphasizes this point. In that case, the court specifically

7

rejected the argument that "an inmate convicted of capital crimes [c]ould be moved back and forth between the general population and the Capital Case Unit, depending upon the status of his execution warrant[.]" 918 A.2d at 161. Although the execution warrant "is the trigger for moving an inmate to the Capital Case Unit" in the first instance, his continued stay in solitary confinement is required by statute, not the status of the warrant, "which might be signed several times over the course of [the] inmate's post-conviction appeals." *Id.* The Department has discretion "where to house" the death-sentenced inmate, but it does not have discretion to remove him from the Capital Case Unit altogether. *Id.* at 160. To the contrary, § 4303 specifically prohibits the Department from exercising the type of discretion suggested by the majority: "Once the governor signed an execution warrant for [Porter], the Department was compelled by [§ 4303] to remove [him] from the general population." *Id.* at 161; *see also Lopez v. Pa. Dep't of Corr.*, 119 A.3d 1081, 1089 (Pa. Commw. Ct. 2015) ("[B]ecause the Legislature has specifically provided that a capital case prisoner shall be kept in solitary confinement until the execution of the death penalty or the inmate's lawful discharge from custody pursuant to section 4303 of the Prisons and Parole code, DOC is required to keep [the inmate] in solitary confinement.").

## IV

The majority also creates for death-row prisoners like Porter a brand-new constitutional right to escape solitary confinement. In fashioning this new right, it precipitately veers into Eighth Amendment territory that we and the Supreme Court have avoided to date. Moreover, the majority's holding on Porter's Eighth Amendment claim is tantamount to a panel reversal of our precedential opinion in *Peterkin v. Jeffes*, 855 F.2d 1021 (3d Cir. 1988).

## A

The majority applies the conditions-of-confinement standard to Porter's Eighth Amendment claim, concluding that he has satisfied both its objective and subjective prongs. Maj. Op. 17. But there are two problems with the majority's analysis. First, Porter's claim does not satisfy the objective

8

prong. Second, his attack on a statutorily required punishment cannot meaningfully be analyzed under the subjective prong.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It applies to the States through the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 675 (1962) (Douglas, J., concurring) (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947)). In the mid-twentieth century, the Court grafted its "evolving standards of decency standard" from death-penalty cases onto "deprivations that were not specifically part of the sentence but were suffered during imprisonment." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (describing *Estelle v. Gamble*, 429 U.S. 97 (1976)).

To succeed on a conditions-of-confinement claim, a prisoner must show that the conditions involve the "unnecessary and wanton infliction of pain." *Id.* (citation and emphasis omitted). We analyze a conditions-of-confinement claim using objective and subjective prongs. *Id.* at 298. The objective prong considers whether a punishment contravenes "the evolving standards of decency that mark the progress of a maturing society[.]" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).

Under the objective prong, a condition of confinement (or a combination of conditions) must produce "the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304. Other basic human needs identified by the Supreme Court include "shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted) (noting that prison officials "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care," and that they are reasonably safe). The deprivation must be "sufficiently serious" and "must result in the denial of 'the minimal civilized measure of life's necessities[.]'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 298, and *Rhodes*, 452 U.S. at 347).

9

Porter does not identify the deprivation of any basic human need recognized by the Supreme Court. As the majority observes, Porter averred that he has experienced "severe anxiety, depression, panic, paranoia, bipolar mood swings, and at sometimes [sic] suicidal impulses. Plaintiff regularly takes depression medication." Maj. Op. 21 (quoting JA 41). In his brief, Porter characterizes the "single, identifiable human need" denied to him as "physical or psychological health, social interaction, or environmental stimulation." Appellant's Br. at 32. And the majority summarizes dicta from *Williams* and other cases describing a purportedly robust scientific consensus pointing to a substantial risk of psychological harm caused by solitary confinement. Maj. Op. 18–21.

From these allegations and dicta, the majority concludes that Porter has satisfied the objective prong of his conditions-of-confinement claim. Maj. Op. 21.[5] But the Supreme Court has not recognized psychological health, social interaction, or environmental stimulation as basic human needs in the Eighth Amendment context. Neither have we.

We have, however, rejected a virtually identical Eighth Amendment challenge to the conditions of confinement on Pennsylvania's death row. In *Peterkin*, we held that the totality of conditions experienced by death row prisoners—isolation for twenty-two hours per day in cells measuring between sixty and seventy-one square feet, allegedly causing psychological and physical deterioration without penological justification—

---

[5] The majority also quotes Justice Kennedy's concurring opinion in *Davis v. Ayala*, 135 S. Ct. 2187, 2208–10 (2015), and Justice Breyer's dissenting opinion in *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015). *See* Maj. Op. 20–21. To these, the majority could have added Justice Breyer's opinions regarding denial of certiorari in *Jordan v. Mississippi*, 138 S. Ct. 2567 (2018), and *Ruiz v. Texas*, 137 S. Ct. 1246 (2017), and Justice Sotomayor's statement respecting the denial of certiorari in *Apodaca v. Raemisch*, 139 S. Ct. 5 (2018). But those impassioned dissents and statements do not support the majority's objective prong analysis. If anything, they underscore the Supreme Court's long-standing and apparently determined refusal to expand the Eighth Amendment as the majority does here.

"does not contravene the [E]ighth [A]mendment." 855 F.2d at 1032. In reaching that conclusion, we emphasized:

> The primary responsibility for operating prisons belongs to prison administrators, to other state law enforcement officials and to the state legislature. The [E]ighth [A]mendment does not authorize a federal court to second guess their decisions nor is it our role to express our agreement or disagreement with their overall policies or theories of prison administration, as long as we find no constitutional violation.

*Id.* at 1032–33 (citation omitted). *Peterkin* remains binding precedent,[6] and as I explain below the majority's attempt to distinguish it is deeply unpersuasive. The result is a *sub silento* panel reversal.

---

[6] *Peterkin* fits comfortably within a long line of our cases rejecting Eighth Amendment challenges to the use of solitary confinement in various contexts. *See, e.g.*, *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997) (no Eighth Amendment violation when prisoner's administrative segregation was not accompanied by the denial of basic human needs, such as food, clothing, shelter, sanitation, medical care, or personal safety); *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) ("Segregated detention [as discipline] is not cruel and unusual punishment *per se*, as long as the conditions of confinement are not foul, inhuman[,] or totally without penological justification."); *Gibson v. Lynch*, 652 F.2d 348, 352 (3d Cir. 1981) (solitary confinement for more than 30 days "cannot be considered to trench upon [plaintiff's] [E]ighth [A]mendment rights"); *United States ex rel. Tyrrell v. Speaker*, 471 F.2d 1197, 1202 (3d Cir. 1973) ("We have said that solitary confinement does not, in itself, violate the Eighth Amendment[.]"); *Gray v. Creamer*, 465 F.2d 179, 187 (3d Cir. 1972) (punitive or administrative segregation did "not clearly present the extreme type of situation required to establish an Eighth Amendment violation"); *Ford v. Bd. of Managers of N.J. State Prison*, 407 F.2d 937, 940 (3d Cir. 1969) ("Solitary confinement in and of itself does not violate Eighth Amendment prohibitions[.]").

11

First, the majority asserts that Porter is making an as-applied challenge to his specific conditions of confinement, whereas *Peterkin* involved a facial challenge to death row conditions generally. *See* Maj. Op. 22–23. This argument mischaracterizes Porter's complaint, and, in any event, the alleged distinction is constitutionally meaningless.

The majority's framing of Porter's Eighth Amendment claim is very different from his actual claim set forth in the Complaint. According to the majority, Porter claims that "Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to solitary confinement for thirty-three years." Maj. Op. 16. But in Count IV of his Complaint—the only cause of action asserting an Eighth Amendment violation—Porter neither attacks any specific conditions of his confinement nor mentions his thirty-three years on death row. Nor does he complain of the deprivation of a basic human need, which is the predicate for any conditions-of-confinement claim. *See Wilson*, 501 U.S. at 304–05. Instead, he merely repackages his *Williams*-based procedural due process claim, giving it an Eighth Amendment label.

Specifically, Porter alleges that Defendants violated his right to be free from cruel and unusual punishment by failing "to remove [him] from 'death row' as housed in solitary confinement *once the sentence of death had been vacated*." JA 44 (Cmpl. ¶ 44) (emphasis added). He further alleges that Defendants violated his Eighth Amendment rights by keeping him "on 'death row' and in solitary confinement *despite Plaintiff's sentence of death being vacated . . . .*" *Id.* (Cmpl. ¶ 46) (emphasis added). The allegations in these paragraphs are mostly verbatim restatements of the allegations in Count III, the procedural due process claim. *See id.* at 43 (Cmpl. ¶¶ 34–36).

In the paragraphs of Porter's Complaint common to all counts, he avers a number of "well established" conditions of solitary confinement—conditions that are the same for death-row inmates throughout Pennsylvania and virtually identical to those challenged in *Peterkin*. *Id.* at 40 (Cmpl. ¶ 12); *cf.*

*Peterkin*, 855 F.2d at 1026–31 (describing challenged conditions of confinement). He then alleges, not that those conditions or any combination of them is cruel and unusual, but that his continued confinement in such "well established" conditions is no longer justified. In support of that allegation, he specifically cites and quotes *Williams*. JA 40 (Cmpl. ¶¶ 13, 14).

In short, Porter has not asserted an as-applied conditions-of-confinement claim based on thirty-three years in solitary confinement. His Eighth Amendment claim is analytically identical to his procedural process claim: He asserts that it is cruel and unusual for Defendants to keep him on death row after his sentence of death was allegedly vacated. Indeed, *all* of the counts in Porter's complaint sound in the exact same *Williams*-based theory.[7]

Even if Porter had asserted a conditions-of-confinement claim, it is readily apparent from his complaint and from the majority's sweeping opinion that he does not raise an as-applied Eighth Amendment challenge. Porter does not complain that the Commonwealth's particular application of its death row statute to him has deprived him of a constitutional right. And he does not complain that the "well established" conditions of solitary confinement in Pennsylvania are somehow different for him than for any other death row inmate. If, as the majority concludes, Porter's continued maintenance in solitary confinement violates the Eighth Amendment, then its holding applies to all similarly situated Pennsylvania inmates. There would be no set of as-applied circumstances under which their solitary confinement could be valid.[8] *See Const. Party of Pa. v. Cortes*, 824 F.3d 386, 394 (3d

---

[7] Even if *Williams* applied to this case, which it does not for reasons I explain above, Porter's *Williams*-based Eighth Amendment claim is bootless. *Williams* considered only a procedural due process claim and did not undertake any Eighth Amendment analysis. That was not an oversight; plaintiffs waived their Eighth Amendment claim on appeal. *Williams*, 848 F.3d at 553 n.8.

[8] The majority's only discussion of Porter's particular situation is a passing reference to his conclusory allegations of harm in the complaint. Maj. Op. 21. But the majority's objective prong

13

Cir. 2016) (discussing as-applied and facial challenges); *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (same).

Finally and most importantly, even if Porter's Eighth Amendment claims really were as-applied, rather than a facial attack on Pennsylvania's death row statute, *it would not matter for purposes of the constitutional analysis*. "[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy[.]'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (citation omitted). But whether a challenge is facial or as-applied "does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Id.* (citation omitted). "Surely it would be strange for the same words of the Constitution to bear entirely different meanings depending only on how broad a remedy the plaintiff chooses to seek." *Id.* at 1127–28 (citations omitted). For all of these reasons, the majority's attempt to distinguish *Peterkin*'s Eighth Amendment holding based on the nature of the remedy sought by Porter is specious.

**2**

The majority next attempts to distinguish *Peterkin* by observing that Porter "has spent substantially more time in solitary confinement on death row than the *Peterkin* plaintiffs." Maj. Op. 24. Again, Porter's Eighth Amendment claim does not challenge the overall duration of his solitary confinement but only his *continued* solitary confinement after 2003, based on a misreading of *Williams*.

In any event, the majority makes no attempt to show why Porter's longer stay on death row is constitutionally significant or legally distinguishes *Peterkin*'s Eighth Amendment holding. Because this section of the majority's opinion is no longer tethered to *Williams*'s procedural due process framework, it appears to hold generally—but with

---

analysis relies most heavily on scientific studies that purport to describe psychological findings for all inmates in any type of solitary confinement, no matter where they are incarcerated. Maj. Op. 18–21.

14

almost no constitutional analysis—that long-term solitary confinement is objectively cruel and unusual even for inmates serving an active death sentence. *See* Maj. Op. 24–25. That is an unwarranted leap from our Eighth Amendment jurisprudence in this area, including *Palakovic v. Wetzel*, 854 F.3d 209 (2017) (finding that prison officials acted with deliberate indifference by repeatedly subjecting a mentally ill and suicidal inmate serving a sentence for burglary to solitary confinement, abusive staff, and inadequate to non-existent mental health care), and from any guidance offered by the Supreme Court.

Still, it is indeed troubling that seventeen years after the habeas court granted relief with respect to Porter's death sentence and stayed its vacatur order pending appeal, he perseveres in solitary confinement and the cross-appeals remain undecided. Porter's habeas appeal was docketed on August 14, 2003. Over the next three years, Porter filed eight motions to stay or temporarily toll briefing, all of which were granted. On November 9, 2006, Porter filed a motion to hold his case in abeyance pending the Pennsylvania state courts' disposition of his petitions for post-conviction relief. We granted Porter's motion over the government's opposition, held the case in abeyance, and required a status report every sixty days. From April 2007 to date, Porter's counsel has duly filed status reports every sixty days, advising this Court that his PCRA petition remains pending before the state PCRA court but never asking this Court to resolve his case. At the same time, Porter has apparently argued to the PCRA court that it lacked authority to rule on his PCRA petition until his federal proceedings were completed. The result is that both this Court and the PCRA court have held their proceedings in abeyance out of deference to each other, creating an exquisite catch-22 gridlock now approaching two decades.

In *Commonwealth v. Porter*, the Supreme Court of Pennsylvania recounted the history of this multi-jurisdictional procedural morass. That court opined that Porter's litigation "strategy—pursued in both state and federal court—has been to avoid having any of [his] collateral claims decided any time soon." 35 A.3d at 15. And in *Commonwealth v. Spotz*, Chief Justice Castille filed a concurring opinion describing in detail and sharply criticizing Porter's litigation strategy, which has

15

"assured a *de facto*, perpetual stay of execution." 18 A.3d 244, 347 (Pa. 2011) (Castille, C.J., concurring). The principle of comity counsels that we at least respectfully consider the Pennsylvania Supreme Court's writings on a matter of direct import to this case.

Porter asserts that his maintenance in solitary confinement after 2003 violates his Eighth Amendment right against cruel and unusual punishment. In evaluating the temporal aspect of that claim, most people exercising common sense would reasonably wonder whether Porter's own strategic decisions may have contributed to his plight. Common sense aside, because legal relevance concerns probabilistic tendencies and the consequences of one's actions, Porter's litigation choices and actions are surely relevant to the length of his time in solitary confinement. *See* Fed. R. Evid. 401.

And because the law assumes that moral actors are responsible for their voluntary actions, courts have uniformly rejected prisoners' arguments that delay caused by their own extended appeals creates an Eighth Amendment violation. *See Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir. 1998); *Stafford v. Ward*, 59 F.3d 1025, 1028 n.5 (10th Cir. 1995); *Turner v. Jabe*, 58 F.3d 924, 928–29 (4th Cir. 1995); *McKenzie v. Day*, 57 F.3d 1461, 1466 (9th Cir. 1995); *Fearance v. Scott*, 56 F.3d 633, 639 (5th Cir. 1995); *Porter v. Singletary*, 49 F.3d 1483, 1485 (11th Cir. 1995). So there is obvious merit in considering the reasons for delay.

I wholeheartedly affirm that no litigant should be criticized for vigorously pursuing his appeal rights. But acknowledging responsibility is different than criticism. And the history of this particular appeal is extraordinary, to say the least. The salient issue, which the majority avoids, is whether Porter—perhaps through less-than-candid maneuvering in two jurisdictions—has thwarted this Court's disposition of his appeal precisely because he does *not* wish to pursue his appeal rights. If so, the majority's argument that *Peterkin* is distinguishable because Porter has spent relatively more time on death row rings especially hollow.

16

Finally, the majority attempts to distinguish *Peterkin* because the "research and caselaw" have allegedly "advanced considerably" since that case was decided. Maj. Op. 24. Even if that were correct, it is insufficient reason for a *panel* to overrule a decision with which it no longer agrees. 3d Cir. I.O.P. 9.1 (2018). But it is incorrect.

The majority overstates the extent to which caselaw has "advanced" in the direction that the majority perceives. The Supreme Court has never held that solitary confinement violates the Eighth Amendment, and it continues to rebuff fervid invitations to do so. *See supra* note 5. Our Court has not held that the conditions of confinement on Pennsylvania's death row are unconstitutional, and we have a long train of decisions to the contrary. *See supra* note 6 (collecting cases). And we are not an outlier. "The practice of solitary confinement remains unrestrained by the Constitution in just about all forms, imposed on just about all groups of prisoners, in just about all jurisdictions in America." Andrew Leon Hanna, *The Present Constitutional Status of Solitary Confinement*, 21 U. Pa. J. Const. L. Online 1, 5 (2019). "[T]he Eighth Amendment has done little to no work in the area of solitary confinement"; indeed, "[i]f there are any true substantive limitations on the conditions presented by solitary or the length of time that a person may be placed in extreme isolation, they have not come from constitutional law." Alexander A. Reinert, *Solitary Troubles*, 93 Notre Dame L. Rev. 927, 932, 944 (2018).

In support of its assertion that caselaw has "advanced considerably" since *Peterkin*, the majority cites one case from another circuit, *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019). *Clarke* was the first and remains the only Court of Appeals decision holding that solitary confinement violates the Eighth Amendment. *See* Maj. Op. 38 ("But only one circuit has [found an Eighth Amendment violation] . . . in connection with solitary confinement on death row."). But its relevance to Porter's case is limited because Virginia—unlike Pennsylvania—did not statutorily require that death-sentenced inmates remain in solitary confinement. Rather, the decision was left solely to the discretion of the state department of

corrections. *See* Va. Code Ann. § 53.1-234. Also, the state defendants inexplicably waived their obligation to adduce legitimate penological considerations justifying the prison officials' discretionary decisions to isolate death row prisoners. And the state defendants did this notwithstanding the court's acknowledgement that "a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement, similar to the challenged conditions on Virginia's death row, even though such conditions create an objective risk of serious emotional and psychological harm." *Clarke*, 923 F.3d at 362–63. One easily distinguishable case in another jurisdiction hardly constitutes a sea change in the law, so I disagree that the caselaw has "advanced considerably."

At bottom, the majority jettisons *Peterkin* because of "scientific and medical research" which allegedly provides insight about solitary confinement that we lacked when deciding *Peterkin* (1988), or for that matter *Young* (1992) and *Griffin* (1997). Maj. Op. 18–21. That seems to me a dubious proposition. Long before such research emerged, Americans well-understood the baleful effect of solitary confinement on some inmates. Alexis de Tocqueville vividly wrote about the American practice in 1833,[9] as did Charles Dickens in 1842.[10] And in 1890, the Supreme Court pointedly remarked:

---

[9] "This experiment, of which the favourable results had been anticipated, proved fatal for the majority of prisoners. It devours the victim incessantly and unmercifully; it does not reform, it kills. The unfortunate creatures submitted to this experiment wasted away . . . ." Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 484 (1997) (citing Torsten Eriksson, *The Reformers, An Historical Survey of Pioneer Experiments in the Treatment of Criminals* 49 (1976) (quoting Alexis de Tocqueville and Gustave de Beaumont)).

[10] "The system here, is rigid, strict, and hopeless solitary confinement. I believe it, in its effects, to be cruel and wrong . . . . [T]here is a depth of terrible endurance in it which none but the sufferers themselves can fathom, and which no man has a right to inflict upon his fellow-creature. I hold this slow and daily tampering with the mysteries of the brain, to be

> A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley*, 134 U.S. 160, 168 (1890).

Throughout the twentieth century, similar criticisms were raised, and political and legal challenges were asserted against the use of solitary confinement. Those controversies attracted the attention of psychologists and psychiatrists who "wrote and testified about the nature, magnitude, and long-term consequences of these acute negative effects." Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 491 (1997).

So while scientific articles may have proliferated in recent years, we have not witnessed some kind of Copernican shift in our understanding. The risk of potential harm from

---

immeasurably worse than any torture of the body: and because its ghastly signs and tokens are not so palpable to the eye and sense of touch as scars upon the flesh; because its wounds are not upon the surface, and it extorts few cries that human ears can hear; therefore I the more denounce it, as a secret punishment which slumbering humanity is not roused up to stay . . . . I solemnly declare, that with no rewards or honours could I walk a happy man beneath the open sky by day, or lie me down upon my bed at night, with the consciousness that one human creature, for any length of time, no matter what, lay suffering this unknown punishment in his silent cell, and I the cause, or I consenting to it in the least degree." Eleanor Umphres, Note, *Solitary Confinement: An Unethical Denial of Meaningful Due Process*, 30 Geo. J. Legal Ethics 1057, 1062 (2017) (quoting Charles Dickens, *American Notes for General Circulation* 54 (1867)).

solitary confinement (as well as the obvious possible Eighth Amendment implications) has long been well-known. More pointedly, it was not lost on our Court when we decided *Peterkin*. We described the plaintiffs' allegations of insanity, suicide, lethargy, anger, and psychological deterioration as "deeply disturbing" though not unconstitutional. *Peterkin*, 855 F.2d at 1033.

None of the "scientific and medical research" upon which the majority relies so heavily was included in the record of this case. So this panel has not even seen the relevant studies. Instead, the majority simply declares that the risk of harms discussed in unidentified scientific and medical research is "well established," citing dicta from other cases and an amicus brief. Maj. Op. 18–21. Thus, the evidentiary burden is neatly flipped in this case: The substantial risk of harm that Porter must show is simply presumed as though it were judicially noticeable.

I believe we should at least attend to the scientific research rather than merely accept descriptions of it, sight-unseen, as settled adjudicative fact. If we did, we may be surprised to find that the allegedly robust consensus is a bit overstated.

For example, in July 2015, President Obama "directed Attorney General Loretta E. Lynch and the Justice Department to review the overuse of solitary confinement across U.S. prisons."[11] As part of that review, the U.S. Department of Justice's National Institute of Justice[12] issued a March 2016

---

[11] Barack Obama, Opinion, *Why We Must Rethink Solitary Confinement*, Wash. Post, Jan. 25, 2016, https://www.washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016/01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html (last visited July 28, 2020).

[12] "The National Institute of Justice (NIJ) focuses on research, development, and evaluation of crime control and justice issues. NIJ provides objective, independent, evidence-based knowledge and tools to meet the challenge of criminal justice, particularly at local and state levels." *See*

paper titled "Administrative Segregation in U.S. Prisons," in which it surveyed the research on the psychological effects of solitary confinement and other types of administrative segregation as practiced throughout the United States. *See* https://www.ncjrs.gov/pdffiles1/nij/249749.pdf (last visited July 28, 2020). Here are some of the findings in the NIJ report:

- "The only clear statement that can be made about the body of literature assessing the psychological effects of solitary confinement is that researchers using different methods to study different populations have come to different conclusions about the psychological effects on inmates." *Id.* at 16.

- "Although rarely acknowledged, the psychological/psychiatric effects research frequently relies on a large body of literature on the effects of sensory deprivation. . . . [I]t is often taken for granted that isolation will have severe and lasting detrimental effects on the psychological well-being of all those exposed to it, even though the evidence in this area does not always bear out this assumption . . . ." *Id.* n.10.

- "Other respected scholars have also been less than convinced by the accumulated evidence regarding psychological effects. Bonta and Gendreau (1990), for example, argued that little evidence exists of deteriorating mental health among inmates, emphasizing that 'long-term imprisonment and specific conditions of confinement such as solitary, under limiting and humane conditions, fail to show any sort of profound detrimental effects.'" *Id.* at 17.

---

https://www.ojp.gov/about/offices/national-institute-justice-nij (last visited July 28, 2020).

21

- Researchers' "findings could just as easily be interpreted as demonstrating that incarceration *in and of itself* has damaging effects on the mental health of individuals subjected to it, especially initially." *Id.* at 18.

- Meta-analytic scholars "found only weak effects of solitary confinement on inmate outcomes (most of which were psychological) and concluded that their meta-analytic review did not find support for the long-argued contention that solitary confinement has lasting psychological effects on those subjected to it." *Id.* at 22.

- Findings from recent meta-analyses "cast some doubts about [solitary confinement] being as devastating to inmates as has often been portrayed in the media and by some human rights organizations, activists, and scholars who vehemently oppose the practice on moral/ethical grounds . . . ." *Id.*

- "After a thorough review of the extant literature [on the practice of all types of administrative segregation throughout the United States], it is clear that, in 2015, the answers continue to be few and the questions many. It is equally clear that when researchers have disagreed, and in this area they have tended to disagree passionately, they have not always been speaking the same language or conducting research with equivalent populations." *Id.* at 23.

- "What is more, for many researchers studying solitary confinement, the practice raises not only empirical

questions but also moral and ethical concerns that will persist regardless of the breadth or depth of the evidence base. Across a literature replete with highly charged emotions, interpreting the evidence and separating evidence from strongly held beliefs have become exceptionally difficult." *Id.*

These bullet points are not fully representative of the NIJ report. It also finds, for example, that "a substantial body of work has established that solitary confinement can have damaging psychological effects, particularly when that confinement involves near complete isolation and sensory deprivation, or when the term of such confinement is extended." *Id.* at 17. But my point is that the purported "consensus" of recent medical and scientific research is not so "robust" and univocal as to justify overturning *Peterkin*, just because that case was decided in 1988. At least according to the NIJ report, the scientific evidence is ambiguous, contested, and ideologically charged. But the majority does not even acknowledge the ongoing debate, choosing instead to repeat broad, one-sided pronouncements.

**B**

The subjective prong of the conditions-of-confinement standard requires a prisoner to establish that prison officials acted with deliberate indifference. *Wilson*, 501 U.S. at 302–03. A prison official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837. The deliberate indifference test is thus individualized for each prison official responsible for inmates' care. The majority asserts that Porter has satisfied the subjective prong because officials from Pennsylvania's Department of Corrections are aware of risks that accompany solitary confinement. Maj. Op. 25–30.

But Porter has not been in solitary confinement because of the discretionary decisions or policies of DOC officials acting with the "requisite culpable state of mind." *See Wilson*, 501 U.S. at 297. Instead, the citizens of Pennsylvania, through their elected representatives in the General Assembly, have

determined that he must remain in solitary confinement while on death row. *See* 61 Pa. Cons. Stat. § 4303. For this reason, I believe the majority's entire discussion of the subjective prong is ill-considered.

As the Court noted in *Wilson*, *Estelle* first extended Eighth Amendment protections to "some deprivations *that were not specifically part of the sentence* but were suffered during imprisonment." 501 U.S. at 297 (emphasis added). Accordingly, the subjective prong is inapplicable when, as here, the challenged condition is "formally meted out *as punishment* by the statute or the sentencing judge." *Id.* at 300; *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 401 (6th Cir. 1999) ("All Eighth Amendment claims have an objective component, and when 'the pain inflicted *is not formally meted out as punishment by the statute* or the sentencing judge, some mental element must be attributed to the inflicting officer' in order to make out the subjective component of an Eighth Amendment violation." (emphasis added) (quoting *Wilson*, 501 U.S. at 300)).

The Supreme Court has applied the conditions-of-confinement standard to medical care;[13] disciplinary (i.e., discretionary) solitary confinement;[14] double celling;[15] injuries caused by prison guards;[16] and injuries caused by other inmates.[17] None of those cases dealt with a statutorily imposed condition of punishment, and for good reasons. The impossibility of imputing subjective intention to a collective body is well-known. *See generally* John F. Manning, *Inside Congress's Mind*, 115 Colum. L. Rev. 1911, 1918–21 (2015); Kenneth A. Shepsle, *Congress Is a "They," Not an "It": Legislative Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992). And *Wilson* makes clear that the subjective prong applies only to "Eighth Amendment claims based on official conduct that does not purport to be the penalty formally

---

[13] *See Estelle v. Gamble*, 429 U.S. 97 (1976).

[14] *See Hutto v. Finney*, 437 U.S. 678 (1978).

[15] *See Rhodes v. Chapman*, 452 U.S. 337 (1981).

[16] *See Hudson v. McMillian*, 503 U.S. 1 (1992); *Whitley v. Albers*, 475 U.S. 312 (1986).

[17] *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Helling v. McKinney*, 509 U.S. 25 (1993).

imposed for a crime[.]" *Wilson*, 501 U.S. at 302. Because the majority elides the critical distinction between the discretionary acts of deliberately indifferent prison officials and the faithful enforcement of a law enacted by the Pennsylvania Legislature, its subjective-prong analysis is unpersuasive.

### V

I agree that Porter's substantive due process claim is barred under the more-specific-provision rule. *See* Maj. Op. 31–33. So I concur with Part III.C. of the majority's opinion.

### VI

The majority holds that qualified immunity is unavailable to Defendants because Porter's procedural-due-process right was clearly established by *Williams*. *See* Maj. Op. 36. I disagree for all of the reasons stated in Part II above. Rather, I believe the majority has created a new procedural-due-process right to be free from solitary confinement notwithstanding an active death sentence. Because that right was not clearly established, Defendants are entitled to qualified immunity on Porter's procedural due process claim.

### VII

Assuming for the sake of argument that Porter's Eighth Amendment right to be free from cruel and unusual punishments was violated, I agree that Defendants are entitled to qualified immunity. *See* Maj. Op. 40. I therefore concur with Part III.D.2. of the majority opinion insofar as it holds that "Defendants are . . . entitled to qualified immunity on Porter's Eighth Amendment claim." *Id.*

\*     \*     \*

This opinion explains my disagreement with the majority's opinion and judgment. It is not about the merits or demerits of solitary confinement. Whether to use solitary confinement at all—and if so, under what circumstances, for which prisoners, the specific conditions of confinement, and the duration of such confinement—is a policy judgment bristling with moral, political, penological, institutional, and

25

religious or philosophical questions. Such policy judgments are reserved for the Legislative Branch[18]—and the Pennsylvania Legislature has made them, at least for inmates who, like Porter, have been sentenced to death following a conviction of murder. For the reasons discussed herein, I respectfully dissent in part from the majority's opinion because I believe it misconstrues the applicable law.

---

[18] *See Bell v. Wolfish*, 441 U.S. 520, 548 (1979) (The "operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." (citation omitted)); *see generally* Bradford R. Clark, *Constitutional Structure, Judicial Discretion, and the Eighth Amendment*, 81 Notre Dame L. Rev. 1149 (2006).